UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------- x
FREEDOM HOLDINGS, INC. d/b/a NORTH :
AMERICAN TRADING COMPANY, and :        **OPINION AND ORDER**
INTERNATIONAL TOBACCO PARTNERS, LTD., :   **GRANTING JUDGMENT**
                                         **DISMISSING COMPLAINT**
                              Plaintiffs, :
                                         :   02 Civ. 2939 (AKH)
              -against-                  :
                                         :
ANDREW M. CUOMO, in his official capacity as :
Attorney General of the State of New York, and :
ROBERT L. MEGNA, in his official capacity as :
Commissioner of Taxation and Finance of the State :
of New York,                             :
                                         :
                              Defendants. :
---------------------------------------------------------------- x

ALVIN K. HELLERSTEIN, U.S.D.J.:

   In 1998, after many years of frustrating federal, state, and private litigation, the

attorneys general of forty-six States entered into a Master Settlement Agreement with the major

cigarette companies.  The New York Supreme Court, reviewing the settlement, found that it went

"well beyond what could have been achieved in plaintiffs' fondest dreams for the result after a

protracted and risky trial," and that it "painstakingly accommodates the public interest" by

compensating the State for past and future public health expenditures caused by cigarette

smoking, while discouraging future cigarette consumption.  New York v. Philip Morris, Inc., 686

N.Y.S.2d 564, 569 (N.Y. Sup. Ct. 1998), aff'd, 693 N.Y.S.2d 36 (N.Y. App. Div., 1st Dep't

1999).

   Ten years have passed since the Master Settlement Agreement became effective.

In that time, New York has reaped substantial benefits from it, consistent with the public

purposes that animated the settlement.  Most prominently, the State has received nearly $7.7

billion in compensation for health care costs, while the number of cigarettes sold each year in the

1

United States has declined by 24%, from 484.5 cigarettes sold in 1997 to 365.8 billion cigarettes sold in 2007.

This lawsuit began in 2002, almost seven years ago. It has been to the Court of Appeals twice, resulting in three opinions. I expressed my views of the probable merits in largely denying Plaintiffs' motion for a preliminary injunction. Since then, and after remand from the Court of Appeals, the parties presented a full record to me and moved for judgment pursuant to Fed. R. Civ. P. 52. At my request, the parties supplemented the record at a three-day evidentiary hearing. I have now heard all relevant arguments, and issue this decision as a final determination of the issues.

Based on the supplemented record, the three opinions issued in this case by the Court of Appeals, and my own findings and conclusions issued in an opinion and order dated September 14, 2004, I hold as follows:

1. Plaintiffs have failed to show that the Master Settlement Agreement and its implementing legislation restrain the ability of non-participating cigarette manufacturers to compete.

2. Plaintiffs have failed to show that the Master Settlement Agreement and its implementing legislation violate the Commerce Clause of the United States Constitution.

3. Plaintiffs have failed to show that New York's Allocable Share Release amendment restrains competition or violates the Commerce Clause.

4. Plaintiffs have suffered no injury to their business or property, actual or threatened.

5. Plaintiffs are entitled to no legal or equitable relief.

Accordingly, for the reasons discussed in this opinion, I grant judgment to Defendants, dismissing the case against them, and dissolve the preliminary injunction that I previously granted.

## I.  **The Prior Proceedings**

At the outset of this case, I dismissed the Complaint, ruling that it failed to allege a legally sufficient claim for relief under either the federal antitrust laws or the Commerce Clause of the United States Constitution.  Order of May 15, 2002.  The Court of Appeals affirmed my ruling as to the Commerce Clause claim, but reversed my ruling as to the antitrust claim and ordered that portion of the Complaint reinstated on remand.  357 F.3d 205 (2d Cir. 2004) (Freedom Holdings I), reh'g denied & opinion revised, 363 F.3d 149 (2d Cir. 2004) (Freedom Holdings II).  After remand and discovery, Plaintiffs moved for a preliminary injunction against enforcement of the Master Settlement Agreement and its implementing legislation in New York.  I denied most of the motion, but enjoined the effectiveness of the recent Allocable Share Release amendment to the New York Public Health Law.  447 F. Supp. 2d 230 (S.D.N.Y. 2004) (Freedom Holdings III).  The Court of Appeals affirmed, holding that Plaintiffs had failed to show irreparable injury, except as regards the Allocable Share Release amendment.  408 F.3d 112 (2d Cir. 2005).

After the second remand, Plaintiffs moved to amend the Complaint to add a count alleging a Commerce Clause violation.  I allowed the amendment because the Court of Appeals had recently reversed the dismissal of a similar Commerce Clause claim in Grand River Enters. Six Nations, Ltd. v. Pryor, 425 F.3d 158, 169-73 (2d Cir. 2005).

At the close of discovery, both Plaintiffs and Defendants moved for summary judgment pursuant to Fed. R. Civ. P. 56 or judgment pursuant to Fed. R. Civ. P. 52.  I agreed to decide the case as if after a bench trial pursuant to Rule 52.  After arguments, presentation of evidence, and submissions of updated economic data, I now deliver my findings and conclusions on a complete record.

In addition, I have reviewed, de novo, the extensive factual record before me in Freedom Holdings III, as reintroduced and supplemented to support the present motions.  Except as specifically indicated below, I adhere to and incorporate here the findings and conclusions of Freedom Holdings III.

## II.  **Summary of the MSA**

In Freedom Holdings III, I presented an extensive summary of the MSA, its interconnecting provisions, and its purposes and applications.  447 F. Supp. 2d at 233-42.  As the parties have pointed out no error, I need not repeat that analysis in fresh detail.  I incorporate it by reference, as the basis of this decision as well, and offer an abridged description here.

The Master Settlement Agreement ("MSA") resolved massive litigation brought by the Attorneys General of forty-six states (including New York), the District of Columbia, and several territories, against the four largest cigarette manufacturing and marketing companies, Philip Morris, Inc., R.J. Reynolds Tobacco Co., Brown & Williamson Tobacco Co., and Lorillard Tobacco Co.[1]  The States alleged that cigarette smoking had caused them to incur billions of dollars in Medicaid and other public health costs, and sought recovery of those costs and injunctive relief to reduce future damage.  They reached an agreement with the companies and entered into the MSA on November 23, 1998.  The MSA required the four major cigarette companies, designated "Original Participating Manufacturers," or OPMs, to make substantial payments to the States pursuant to several formulas, immediately and over time.  Collectively, they were to pay about $2.4 billion in the first year and about $225 billion over the next twenty-five years.  In exchange, the States surrendered past, present, and future tobacco-related claims against the OPMs.  The MSA contemplated that the OPMs would meet their payment obligations

---

[1] Philip Morris is now a wholly-owned subsidiary of Altria Group, Inc.  Brown & Williamson and R.J. Reynolds have since merged, forming a new parent, Reynolds American, Inc.

by increasing the prices of their cigarettes, thereby reducing future public cigarette consumption. The amount owed by each OPM would be adjusted annually to account for inflation and changes in the OPMs' relative market shares.  See Freedom Holdings III, 447 F. Supp. 2d at 234-35.

In approving the settlement, the New York Supreme Court found that the MSA achieved New York's most important goals when it first filed suit.  New York v. Philip Morris, 686 N.Y.S.2d at 568.  Most plainly, the MSA compensated New York for past public health expenditures while promising a revenue stream to pay for future care.  In addition, by charging more for cigarettes, the OPMs promoted the public health by discouraging present smokers from continuing and potential smokers from beginning.  The MSA's other provisions also advanced the same public health goal by banning advertising and sales of cigarettes to minors, requiring greater disclosure of the health effects of tobacco and nicotine, and requiring the OPMs to fund educational and clinical programs that publicize and treat the health consequences of smoking.[2] The MSA "goes well beyond what could have been achieved in plaintiffs' fondest dreams for the result after a protracted and risky trial," the New York Supreme Court concluded, "and . . . painstakingly accommodates the public interest."  Id. at 569; see N.Y. Pub. Health Law § 1399-nn(5).

The MSA encouraged other cigarette companies to participate in the settlement as "Subsequent Participating Manufacturers," or SPMs.  It provided a "grandfathered" benefit to companies that joined the MSA within sixty days of November 23, 1998, its execution date. These grandfathered SPMs incur payment obligations only if their share of the total cigarette market exceeds the greater of their 1998 share or 125% of their 1997 share.  Those payment obligations, like those of SPMs that joined the MSA after the sixty day period, are determined

---

[2] Indeed, the New York Supreme Court noted that litigation, or even legislation, could not have achieved some aspects of the MSA, like the OPMs' waiver of their First Amendment advertising and lobbying rights.  New York v. Philip Morris, 686 N.Y.S.2d at 568 & 569 n.6; see Freedom Holdings III, 447 F. Supp. 2d at 250.

according to an arithmetical formula that results in payments similar to those required of OPMs.[3]
Together, the OPMs and SPMs are designated "Participating Manufacturers," or PMs.

    The States and the OPMs anticipated that the design of the MSA was vulnerable
to the actions of companies that chose not to join it, designated "Non-Participating
Manufacturers," or NPMs.  If NPMs could sell cigarettes at prices that did not reflect the
settlement burden assumed by PMs, the entire structure of the MSA would be defeated, and the
fundamental goal of reducing cigarette consumption would be frustrated.  To solve this problem,
the MSA provided for States to adopt legislation known as "Escrow Statutes," which require
NPMs to make payments into state-specific escrow accounts that are somewhat less than, but
roughly equivalent to, the payments required by PMs.  These payments prevent NPMs from
taking advantage of the MSA by significantly undercutting PMs on price, and assure the States
that funds will be available to pay damages if the States prevail in lawsuits against NPMs.  See
N.Y. Pub. Health Law § 1399-nn(6) ("It is thus in the interest of the state to require that [NPMs]
establish a reserve fund to guarantee a source of compensation and to prevent such
manufacturers from deriving large, short-term profits and then becoming judgment-proof before
liability may arise.").  Thus, the Escrow Statutes preserve the MSA and the public health benefits
that it sought to foster.

---

[3] The annual payment obligations of grandfathered SPMs and non-grandfathered SPMs are calculated differently.
See MSA Art. IX(i).  If a grandfathered SPM's sales increase, it pays a portion of the total SPM adjusted base
payment (which is a volume-adjusted version of the total OPM base payment).  This portion is determined by
dividing the increase in the grandfathered SPM's market share by the current aggregate market share of OPMs.
Thus:

$$\frac{\text{(current market share)} - \text{(greater of 1998 market share or 125\% of 1997 market share)}}{\text{current aggregate market share of OPMs}}$$

A non-grandfathered SPM also pays a portion of the total SPM adjusted base payment, but regardless of whether its
market share increased, remained flat, or decreased.  This portion is determined by dividing its actual market share
(not just the increase) by the current aggregate market share of OPMs.  See MSA Art. IX(i)(4).

If a State fails to enact or "diligently enforce" an Escrow Statute, it exposes itself to the MSA's "NPM Adjustment" provision, which can reduce OPMs' MSA payments. MSA Art. IX(d). If the OPMs prove that they collectively lost market share to the NPMs, that the MSA was a "significant factor" in that loss, and that the State in issue failed to enact or diligently enforce an Escrow Statute, the OPMs can reduce their payments by three times the amount of market share loss over 2%. MSA Art. IX(d)(1). To date, no NPM adjustment has been granted, although The Brattle Group, the firm tasked with making the "significant factor" determination, concluded in 2003, 2004, and 2005 that the MSA had been a "significant factor" in the OPMs' loss of market share. See Pl. Exh. 362, ¶ 228. The Brattle Group's determination, however, must be paired with an arbitrator's finding that a State failed to "diligently enforce" its Escrow Statute, which has yet to occur.

In 2001, to aid enforcement of its Escrow Statute, New York passed its Contraband Statute. N.Y. Tax Law §§ 480-b, 481(1)(c), 1846. The Contraband Statute requires every cigarette manufacturer selling cigarettes in New York to certify annually that it is either making payments under the MSA as a PM or complying with the Escrow Statute as an NPM. A manufacturer that fails to certify under the Contraband Statute is denied state tax stamps, which allow a manufacturer to sell cigarettes without incurring regulatory and monetary penalties.

The PMs deposit their annual payments into a national escrow account, from which each State receives its "allocable share." This share, fixed in the MSA, generally represents the State's proportional burden of past and future damages. Freedom Holdings III, 447 F. Supp. 2d at 236; see MSA Exh. A. Initially, Escrow Statutes provided that NPMs could claim a refund of their annual escrow payment to the extent that the amount they paid exceeded the State's allocable share of total national payments. This Allocable Share Release provision

7

allowed NPMs to reduce their overall obligations by concentrating their sales within a single State or a few States, thereby becoming entitled to refunds from the States and lowering their marginal escrow payments significantly below the costs incurred by OPMs.  For example, if an NPM sold cigarettes only in New York, which has an allocable share of 12.76%, it could receive a credit for all per-cigarette payments under New York's Escrow Statute that exceed 12.76% of its total sales, despite selling 100% of its cigarettes in the State.

The States, including New York, began to repeal the Allocable Share Release provisions of their Escrow Statutes, thereby eliminating the yearly refunds.  In Freedom Holdings III, I enjoined New York from repealing its Allocable Share Release provision.  See N.Y. Pub. Health Law § 1399-pp, as amended, 2003 N.Y. Laws 666, eff. Oct. 15, 2003.  I was concerned, given the paucity of market data, that the repeal could "jeopardize the ability of the NPMs to compete with the SPMs and OPMs," and I considered that more experience was needed.  447 F. Supp. 2d at 246.  Since then, every MSA State but one has likewise amended its Escrow Statute to preclude any yearly recovery of escrowed funds, to prevent market leveraging by regional NPMs at the expense of PMs.

### III.  Developments Since *Freedom Holdings III*

In this section, I present new developments and updated data from the four years since my decision in Freedom Holdings III.  PricewaterhouseCoopers, the independent auditor appointed under the MSA, charts the annual tax costs of cigarettes from reports of federal excise taxes paid by manufacturers and sellers of cigarettes, as well as U.S. Customs data.  Freedom Holdings III presented the relevant data, comparative statistics among OPMs, SPMs, and NPMs, which the parties have extended through 2007.  See 447 F. Supp. 2d at 238.

The updated reports reveal that the payment structure of the MSA does not favor the major cigarette companies over those companies that either did not join the MSA, or joined the MSA at some later date.  <u>See</u> Table 1.  The OPMs continue to pay more per carton ($5.31 in 2007), including payments to the four previously settled states, than do the non-grandfathered SPMs ($5.07), and both pay more than NPMs pay under the Escrow Statutes ($5.02).  Grandfathered SPMs, viewed in isolation, have the lowest average payment obligation ($2.63), since they pay nothing for cigarettes sold up to their grandfathered threshold (the greater of their 1998 market share or 125% of their 1997 market share).  However, for sales beyond this threshold, grandfathered SPMs pay about what non-grandfathered SPMs pay ($5.07), which is more than NPMs pay.  Tr. 257-58, 276-77;[4] <u>see</u> Def. Exh. E, tbl. 3; Def. Exh. H, tbl. 3.

The reports also reveal that the MSA, as intended by the States, has produced a secular decrease in cigarette consumption.  <u>See</u> Table 2.  Both the total volume of annual cigarette sales and the volume of cigarettes sold annually by the OPMs have decreased steadily since the MSA's inception.  The total number of cigarettes sold fell from 484.5 billion cigarettes in 1997 to 365.8 billion cigarettes in 2007, a decline of about 24%.  Def. Exh. E, tbl. 1.

Finally, the reports reveal that the competitive dominance of the major cigarette companies has slipped significantly over the life of the MSA.  <u>See</u> Table 2.  In 1997, the OPMs controlled 97.1% of the market, but their share fell to 85.9% in 2002 and has remained steady since then.  Sales by SPMs represented 8.8% of the market in 2007, a drastic increase from their 2.5% share of the market in 1997.  NPMs' share of the market rose from 0.4% in 1997 to a peak of 8.1% in 2003, but declined somewhat to 5.4% in 2007.[5]

---

[4] "Tr." refers to the transcript of the evidentiary hearing held on November 18-20, 2008.
[5] General Tobacco, the largest NPM to become a non-grandfathered SPM, joined the MSA in July 2004, which accounts for the fact that the SPMs' total market share has expanded slightly at the NPMs' expense in the years since.  Tr. 268-76, 314-15; Def. Exh. W, tbl. 1b.

In 2007, New York was due about $905 million under the MSA.  From all PMs, from 1999 through 2008, New York has received nearly $7.7 billion under the MSA.  Tr. 261-65; <u>see</u> Def. Exh. F, tbl. 6.

In sum, the updated data offer no evidence that the MSA has either favored the OPMs or prejudiced the NPMs competitively.  SPMs and NPMs continue to compete vigorously with OPMs for market share.  Together, they have accumulated market share at the expense of the OPMs, which controlled 97.1% of the market in 1997, but only 85.9% in 2007.  NPMs controlled 0.4% of the cigarette market in 1997 and now control 5.4% of the market.  Moreover, these market statistics understate NPM sales because many NPMs sell cigarettes through the Internet or Indian reservations to avoid federal excise tax collection, and such sales exist outside PricewaterhouseCoopers's data.  Tr. 239-40, 317-18, 364-65.

**Table 1**

**Average OPM, SPM, and NPM Payments per 200-Cigarette Carton (to nearest cent)[6]**

| YEAR | OPMs | Grandfathered SPMs[7] | Non-Grandfathered SPMs | NPMs |
|------|------|-----------------------|------------------------|------|
| 1999 | $3.91 | $0.48 | $2.02 | $1.94 |
| 2000 | $4.39 | $0.81 | $2.39 | $2.23 |
| 2001 | $5.20 | $1.31 | $3.18 | $2.99 |
| 2002 | $5.05 | $1.65 | $3.34 | $3.08 |
| 2003 | $4.21 | $1.87 | $4.02 | $3.90 |
| 2004 | $4.28 | $1.81 | $4.07 | $4.03 |
| 2005 | $4.49 | $2.12 | $4.27 | $4.16 |
| 2006 | $4.59 | $2.33 | $4.35 | $4.29 |
| 2007 | $5.31 | $2.63[8] | $5.07 | $5.02 |

---

[6] Def. Exh. E, tbl. 3.

[7] This column represents the average payment for all cigarettes sold by grandfathered SPMs—that is, sales both below and above the grandfathered threshold.

[8] For cartons sold above the SPMs' grandfathered thresholds, the marginal per-carton payment was $5.07 in 2007, matching the average per-carton payment of non-grandfathered SPMs. See Def. Exh. H, tbl. 3.

**Table 2**

**OPM, SPM, and NPM Market Share (to nearest 0.1%) and**

**Total Market Size (in billions of cigarettes, to nearest 100 million)[9]**

| Year | OPMs | Grandfathered SPMs[10] | Non-Grandfathered SPMs | NPMs[11] | Total Market Size |
|------|------|------|------|------|------|
| **1997** | 97.1% | 2.5% | 0.0% | 0.4% | 484.5 |
| **1998** | 96.5% | 3.0% | 0.0% | 0.5% | 459.3 |
| **1999** | 93.9% | 4.4% | <0.1% | 1.6% | 439.1 |
| **2000** | 91.5% | 5.3% | <0.1% | 3.2% | 432.9 |
| **2001** | 89.4% | 6.2% | 0.1% | 4.3% | 426.3 |
| **2002** | 85.9% | 7.2% | 0.1% | 6.7% | 414.3 |
| **2003** | 84.5% | 6.8% | 0.7% | 8.1% | 399.9 |
| **2004** | 84.8% | 6.5% | 1.3% | 7.3% | 400.3 |
| **2005** | 85.3% | 7.2% | 1.8% | 5.7% | 384.3 |
| **2006** | 84.8% | 7.8% | 2.0% | 5.3% | 384.7 |
| **2007** | 85.9% | 7.6% | 1.2% | 5.4% | 365.8 |

---

[9] Def. Exh. W, tbl. 1a; Def. Exh. E, tbl. 1.

[10] For 1997, 1998, and 1999, the figures for grandfathered SPMs include all such companies, regardless of when they joined the MSA.

[11] Theodore Martens of PricewaterhouseCoopers testified that his firm derives the data in this column by subtracting OPM and SPM volume totals from the total market volume as determined from federal excise tax data, since PricewaterhouseCoopers is not authorized to access tax data for NPMs. Tr. 270-71.

## IV. <u>Discussion</u>

### A. <u>Standard for Judgment</u>

Both sides move on the complete record for judgment pursuant to Rules 52 and 56 of the Federal Rules of Civil Procedure, asking me to resolve such factual issues as I may find, treating the record as equivalent to that produced by a bench trial. Because both sides represent that they have presented all relevant evidence, because no questions of credibility require live testimony, and because expert witnesses testified at my request to clarify ambiguous points, I gave my consent. Therefore, this opinion presents my findings of fact and conclusions of law as if after a full trial.

### B. <u>Standing</u>

To establish standing to sue under Article III of the United States Constitution, a plaintiff must show "that it has suffered a concrete and particularized injury that is either actual or imminent, that the injury is fairly traceable to the defendant, and that it is likely that a favorable decision will redress that injury." <u>Massachusetts v. EPA</u>, 127 S. Ct. 1438, 1453 (2007) (citing <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555, 560-61 (1992)). The "gist of the question of standing" is whether the plaintiffs have a sufficient stake in the outcome of the controversy to assure genuine adverseness and clear presentation of the issues at stake. <u>Id.</u>; <u>see also</u> <u>Baker v. Carr</u>, 369 U.S. 186, 204 (1962). In a lawsuit challenging the legality of government action, it is typically easier for a direct object of the challenged action to establish standing than it is for one alleging the "unlawful regulation . . . of *someone else*." <u>Lujan</u>, 504 U.S. at 561-62. However, such a plaintiff may nonetheless establish standing by demonstrating that the response of third parties to the challenged regulation threatens or causes an injury to the plaintiff, and that judgment for the plaintiff will redress the injury caused by third parties responding to the regulation. <u>Id.</u>; <u>see</u> <u>Allen v. Wright</u>, 468 U.S. 737, 757-66 (1984).

In addition to establishing Article III standing, a plaintiff seeking an injunction pursuant to § 16 of the Clayton Act, 15 U.S.C. § 26, must "allege threatened loss or damage 'of the type the antitrust laws were designed to prevent and that flows from that which makes defendants' acts unlawful.'" Cargill, Inc. v. Monfort of Colo., Inc., 479 U.S. 104, 109-13 (1986) (quoting Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 489 (1977)).  The antitrust standing analysis is more flexible and less demanding for claims for injunctive relief than it is for those seeking money damages, because "one injunction is as effective as 100, and . . . 100 injunctions are no more effective than one." Id. at 111 n.6 (quoting Hawaii v. Standard Oil Co., 405 U.S. 251, 261 (1972)); see also Daniel v. Am. Bd. of Emergency Med., 428 F.3d 408, 443-44 (2d Cir. 2005); Consol. Gold Fields PLC v. Minorco, S.A., 871 F.2d 252, 257-60 (2d Cir. 1989).

Plaintiff Freedom Holdings, Inc. ("Freedom Holdings") imports cigarettes manufactured abroad for resale to a Native American distributor in Salamanca, New York that does not affix tax stamps pursuant to New York's Contraband Statute.  Accordingly, Freedom Holdings has never sold cigarettes tax-stamped pursuant to that law or made escrow payments pursuant to New York's Escrow Statute.  See N.Y. Tax Law §§ 480-b, 481(1)(c), 1846; N.Y. Pub. Health Law § 1399-nn-pp.  Freedom Holdings claims that it wants to market and sell its Image brand cigarettes through other distributors in New York, and that it will do so if it prevails in this case.

Plaintiff International Tobacco Partners, Ltd. ("ITP") imports Cobra brand cigarettes from International Masis Tabac, an Armenian manufacturer, for resale to direct buying wholesalers in New York.  ITP has opened an escrow account in New York on behalf of International Masis Tabac, and deposits the statutory escrow payments into that account. International Masis Tabac has declared that ITP bears responsibility for such payments, and thus

14

is entitled to any funds released pursuant to New York's Allocable Share Release provision, although ITP sells only a fraction of its total sales volume in New York and has not sought any release of funds.

Plaintiffs seek a declaratory judgment that the MSA and its implementing legislation, the Escrow and Contraband Statutes, violate the Commerce Clause of the U.S. Constitution, § 1 of the Sherman Act, and § 16 of the Clayton Act.  U.S. Const. art. I, § 8; 15 U.S.C. §§ 1, 26.  Plaintiffs also seek a permanent injunction against enforcement of New York's Escrow and Contraband Statutes, along with fees and costs.  See N.Y. Pub. Health Law § 1399-nn-pp; N.Y. Tax Law §§ 480-b, 481(1)(c), 1846.  Plaintiffs do not seek money damages.  Second Suppl. & Am. Compl. ¶¶ 93-102 & Prayer for Relief.

The MSA and Escrow and Contraband Statutes impose obligations on manufacturers and licensed, tax-stamping wholesalers, but they do not directly obligate Plaintiffs, who are distributors and importers.  See N.Y. Pub. Health Law §§ 1399-nn-pp; N.Y. Tax Law §§ 480-b, 481(1)(c), 1846.  Defendants argue that Plaintiffs therefore lack Article III standing to assert their claims.  However, Plaintiffs' inability to sell cigarettes without making statutory escrow payments, directly or indirectly, satisfies the constitutional requirement of an injury in fact.  This injury is redressable because an injunction against operation of the challenged statutes would allow Plaintiffs to sell cigarettes without making the allegedly anticompetitive and illegal escrow payments.  See, e.g., Lujan, 504 U.S. at 561-62.  The causal connection between the challenged state action and Plaintiffs' injury is sufficiently direct and non-speculative.  Therefore, Plaintiffs have satisfied their burden to demonstrate standing under Article III.

Plaintiffs also have standing to sue for an injunction pursuant to § 16 of the Clayton Act.  15 U.S.C. § 26.  If Plaintiffs were seeking damages under § 4 of the Clayton Act, arguing that the MSA creates an anticompetitive cartel that reduces output to charge higher

prices, they would lack antitrust standing.  Though such conduct would violate the law, Plaintiffs would benefit, not suffer, from both higher market prices and the chance to undersell members of the cartel to capture new market share.  See Matsushita Elec. Indus. Corp. v. Zenith Radio Corp., 475 U.S. 574, 583 (1986).  However, Plaintiffs seek injunctive relief, for which the standing inquiry is more flexible, reflecting greater concern for the public interest and reduced risk of duplicative recovery.  See Minorco, 871 F.2d at 260 n.6.  Plaintiffs allege that New York passed the Escrow and Contraband Statutes to further its agreement with the four major manufacturers to punish NPMs for competing with members of the MSA cartel.  Because allegations of "[l]osses inflicted by a cartel in retaliation for an attempt . . . to compete" constitute a valid antitrust claim, Plaintiffs have established standing to sue under the Sherman and Clayton Acts.  Hammes v. AAMCO Transmissions, Inc., 33 F.3d 774, 783 (7th Cir. 1994); see also Volvo N. Am. Corp. v. Men's Int'l Prof'l Tennis Council, 857 F.2d 55, 67-68 (2d Cir. 1988).

### C.      Sherman Act Preemption

In Freedom Holdings I, the Court of Appeals held that Plaintiffs had stated a legally sufficient claim for relief that the Sherman Act, 15 U.S.C. § 1, preempts New York's Escrow and Contraband Statutes.  It explained that a "two-step analysis" determines whether a state statute is preempted:  First, a plaintiff must show that the statute creates a scheme that would be a "per se violation" of the Sherman Act if arranged privately, and second, a plaintiff must show that the state action doctrine of Parker v. Brown, 317 U.S. 341 (1943), does not immunize the statute from preemption.  Freedom Holdings I, 357 F.3d at 222-23.  Accepting the allegations of the Complaint as proved, the Court of Appeals held that the MSA reflects an agreement among private parties, aided and abetted by the States, to create a scheme for market control, that the scheme "mandates or authorizes conduct" or "places irresistible pressure" on parties to violate the antitrust laws, and that such conduct "in all cases" constitutes a "per se

violation" of the Sherman Act.[12]  It further held that <u>Parker</u> immunity was unavailable because New York had neither "clearly articulated" the "legitimate state policy goals" behind the MSA nor "actively supervised" the mechanisms that advance those goals to minimize "unnecessary anticompetitive effects."  <u>Id.</u>; <u>see</u> <u>Cal. Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc.</u>, 445 U.S. 97, 105 (1980).  Accordingly, the Court of Appeals concluded that Plaintiffs had stated a legally sufficient claim for relief that the Sherman Act preempts the Escrow and Contraband Statutes.

I hold, based on my findings of fact and conclusions of law in <u>Freedom Holdings III</u>, and informed by renewed consideration of my legal analysis and updated data presented by the parties at an evidentiary hearing to clarify ambiguities, that Plaintiffs have failed to prove that the MSA and its implementing legislation in New York constitute a per se violation of the Sherman Act.  I also hold that the <u>Parker</u> state action doctrine immunizes the Escrow and Contraband Statutes from Sherman Act preemption.

### 1.  <u>Per Se Violation</u>

In <u>Freedom Holdings III</u>, I noted that the caselaw has developed two different understandings of what constitutes a per se violation of the antitrust laws.  447 F. Supp. 2d at 248-52.  The first understanding examines the restraint and its effects in the context of any redeeming social benefits, while the second looks only to the abstract character of the restraint.  I concluded that Plaintiffs had not shown a likelihood of success on their antitrust preemption claim under either understanding.  At a minimum, Plaintiffs must show that the MSA and its implementing legislation frustrate competition in the cigarette market.  The Supreme Court has

---

[12] Accepting as proved the Complaint's allegation that the challenged statutes grant regulatory power to private actors, the Court of Appeals ruled that the Escrow and Contraband Statutes were not merely unilateral acts of state government, but "hybrid restraint[s]" vulnerable to preemption by the federal antitrust laws.  <u>Id.</u> at 223; <u>see</u> <u>324 Liquor Corp. v. Duffy</u>, 479 U.S. 335, 345-46 n.8 (1987).

held that, to establish a per se antitrust violation arising from a state statute, a plaintiff must show that the statute "mandates or authorizes conduct that necessarily constitutes a violation of the antitrust laws in all cases, or . . . places irresistible pressure on a private party to violate the antitrust laws in order to comply with the statute."  Rice v. Norman Williams Co., 458 U.S. 654, 661 (1982); see 324 Liquor Corp. v. Duffy, 479 U.S. 335, 345 n.8 (1987) ("[F]ederal antitrust laws pre-empt state laws authorizing or compelling private parties to engage in anticompetitive behavior.").  Only authorized or compelled practices that have a "pernicious effect on competition and lack . . . any redeeming virtue" are deemed per se antitrust violations.  Rice, 458 U.S. at 659 n.5.

        In their Second Supplemental and Amended Complaint, Plaintiffs allege that the MSA creates, and the Escrow and Contraband Statues enforce, an illegal output cartel engaged in market division and price-fixing.  They argue that the MSA discourages the OPMs comprising the cartel from gaining market share relative to each other by increasing their payment obligations if they do so.  Allegedly, the MSA thereby encourages OPMs to raise prices beyond the level necessary to accommodate their payment burdens, because they know that the other OPMs will follow their price increases rather than gain market share.  Thus, Plaintiffs conclude that the OPMs can amass a fund for advertising and marketing that overwhelms the NPMs' ability to compete.  The States, Plaintiffs allege, sponsor this scheme and protect the OPMs' market dominance because they reap enormous sums from annual payments under the MSA.  Accordingly, Plaintiffs claim that the Escrow and Contraband Statutes bind the NPMs into a market in which they cannot compete.[13]  Accepting the allegations as proved, the Court of

---

[13] The Court of Appeals summarized Plaintiffs' allegations:  "[T]he combination of the MSA, the Escrow Statutes, and the Contraband Statutes, allows OPMs to set supracompetitive prices that effectively cause other manufacturers either to charge similar prices or to cease selling. . . . NPMs are forced to charge these prices to cover the costs

Appeals found that Plaintiffs had "sufficiently alleged a per se violation of the Sherman Act" because the MSA, as described in the Complaint, is a "naked restraint on competition, albeit one subject to erosion by NPMs." Freedom Holdings I, 357 F.3d at 226.

The proofs do not sustain Plaintiffs' allegations. The MSA and the Escrow and Contraband Statutes neither inhibit competition nor lack redeeming virtue. See Rice, 458 U.S. at 659 n.5. The proofs reveal that the NPMs have retained pricing autonomy and gained substantial market share at the expense of the OPMs, and that ample evidence of the MSA's redeeming public health virtues belies any anticompetitive design.

The proofs do not show a "pernicious effect on competition" caused by the MSA and the Escrow and Contraband Statutes. See id. To the contrary, they show plainly that NPMs like Plaintiffs have not suffered any competitive injury as a result of the MSA. Since 1999, the NPMs have competed vigorously to increase their share of the domestic cigarette market from 0.4% in 1997 to 5.4% in 2007. Over the same term, the market share of the OPMs has declined from 97.1% to 85.9%. These trends have occurred in a market whose total volume has contracted from 484.5 billion to 365.8 billion cigarettes sold annually, a contraction in sales and consumption that has advanced the public heath aims of the States considerably.[14] In Freedom Holdings I, the Court of Appeals considered that, by measuring PMs' payment obligations by their relative market shares, the MSA discourages growth and natural competition. The data, however, reveal that neither NPMs nor SPMs have acted as if discouraged.

The fact that NPMs have not suffered competitively, but rather prospered, over the life of the MSA is unsurprising because nothing in the MSA or its implementing

---

imposed by the Escrow and Contraband Statutes or go out of business in New York." Freedom Holdings I, 357 F.3d at 226.

[14] Plaintiffs also contend that the decline in cigarette consumption began before the MSA, but no one can say that the MSA did not provide a major impetus to cause the decline to continue and accelerate.

legislation hinders NPMs in relation to PMs.  The payment structure compelled by the MSA and

the Escrow Statutes has not disadvantaged NPMs.  Indeed, the proofs show that NPMs have

actually paid less per carton ($5.02 in 2007) than have their competitors ($5.31 for OPMs, $2.63

with a marginal rate of $5.06 for grandfathered SPMs, and $5.07 for non-grandfathered SPMs).

See N.Y. Pub. Health Law § 1399-pp(2) (fixing flat rate of $0.0188482 per cigarette).  These

figures undermine the argument that "NPMs are deterred from seeking increased market share

because the high costs of compliance with the Escrow Statute preclude their competing through

lower prices."  Freedom Holdings II, 363 F.3d at 152; see KT&G Corp. v. Att'y Gen. of Okla.,

535 F.3d 1114, 1133 (10th Cir. 2008) ("In light of the fact that [OPMs, SPMs, and NPMs] all

face roughly the same per-cigarette cost under either the MSA or the allocable share amendment,

there is no indication that they will avoid increasing their own market share, nor is there any

suggestion that they will not unilaterally make their own pricing and output decisions.").

Nonetheless, Plaintiffs argue that the MSA disfavors NPMs because OPMs and SPMs may

deduct their MSA payments from their income taxes, but NPMs may not similarly deduct their

payments to state escrow funds.  Those PMs, however, may not recover their payments once

made, while NPMs receive annual interest earnings on escrowed funds and will recover, after

twenty-five years, any funds not applied to judgments or settlements with the States.

Alternatively, NPMs may become eligible to deduct their payments by disclaiming their rights to

interest income and reversion of principal.  Freedom Holdings III, 447 F. Supp. 2d at 259; see

Int'l Tobacco Partners, Ltd. v. Kline, 475 F. Supp. 2d 1078, 1083 n.8 (D. Kan. 2007).  Thus, I

found in Freedom Holdings III that nothing in the MSA or the Escrow and Contraband Statutes

imposes a relative tax hardship on NPMs.  Plaintiffs have offered no evidence to cause me to

change my mind.

Many NPMs have joined the MSA, even as non-grandfathered SPMs.  But Plaintiffs have presented no reason to infer from this trend that the MSA particularly burdens NPMs.  No evident economic force drives NPMs to the MSA.  NPMs that become SPMs pay no less to the States than what they paid under the Escrow and Contraband Statutes, and by joining the MSA they subject themselves to upward payment adjustments tied to any gain in market share.  It is true that grandfathered SPMs pay the least per carton of all manufacturers, but, as I explained in <u>Freedom Holdings III</u>, they pay more than NPMs pay for each successive cigarette they produce, and it is that marginal cost, not the average cost, that drives manufacturers' pricing decisions.  <u>See</u> 447 F. Supp. 2d at 257-58.  In his testimony, Professor Jonathan Gruber explained the basic microeconomics principle of marginal cost pricing to maximize a firm's profits, and stated that, in the competitive cigarette industry, a manufacturer will price its products at or above its marginal cost, not its average cost, for each unit produced.  Tr. 325-31.  Gruber further testified that there is no reason why a cigarette manufacturer, whether OPM or grandfathered SPM, would price its product below its marginal cost of production, even if that manufacturer is a member of a cartel.  Tr. 337-38.  The "increased marginal costs to the SPMs above the grandfathered levels can be viewed as a means of recouping those funds which were lost to the states through the grandfather provision."  <u>Freedom Holdings III</u>, 447 F. Supp. 2d at 258.  Thus, whatever benefit an SPM such as Liggett Group or Commonwealth Brands enjoys due to the grandfathering provision is not reflected in its pricing decisions, and so has no bearing on marketplace competition.  Grandfathered SPMs make the same per-carton payment on marginal sales above their grandfathered thresholds as non-grandfathered SPMs make on every carton they sell, and that payment exceeds the escrow payment required of NPMs.[15]  The MSA

---

[15] The Court of Appeals credited Plaintiffs' argument that the MSA's SPM payment formula penalizes SPMs that gain market share from OPMs, which allegedly compels SPMs to follow OPM price increases to avoid gaining

attracts NPMs by offering certainty, not shelter from market forces, as SPMs gain immunity from potentially devastating future litigation with the States.  By contrast, NPMs have chosen to accept uncertainty and the benefit of lower payment obligations under the Escrow and Contraband Statutes, including the potential recovery of some or all of their escrow payments.

The MSA has not caused Plaintiffs or other NPMs to surrender pricing autonomy. Through the testimony of Christopher Nelson, Chief Financial Officer of Freedom Holdings, and Jeffrey Avo Uvezian, President of ITP, Plaintiffs concede that their pricing decisions are made independently and that they are not compelled to follow price leadership by their larger competitors.  Tr. 109-10; Nelson Dep. 180-81.  Likewise, Kevin Altman, who set prices for two NPMs, CigTec and JJA Distributors LLC, testified that both companies made independent pricing decisions that were not dictated by OPMs or SPMs.  Tr. 87-88.  The aggregate historical data of SPM and NPM market shares, reproduced above, support this testimony.  Under the MSA and the Escrow and Contraband Statutes, the OPMs exercise no power, direct or indirect, over the cigarette prices charged by NPMs.  Indeed, independent NPMs have taken competitive advantage of higher prices charged by the large cigarette manufacturers.  Only the Escrow Statutes impact NPMs' cost structure.  See KT&G Corp., 535 F.3d at 1129, 1133; Sanders v. Brown, 504 F.3d 903, 911 (9th Cir. 2007) ("Nothing . . . forces the NPMs to either peg their prices to those of participating manufacturers, or to refrain altogether from entering the market.") In essence, Plaintiffs allege that New York violates the antitrust laws by compelling NPMs to make payments to escrow funds that they would prefer not to make.  This unhappiness, however,

---

market share at their expense.  Freedom Holdings II, 363 F.3d at 153.  It is true that the denominator of the ratio used in the formula causes the collective market position of the OPMs to affect what an individual SPM must pay, and that, as a result, if an SPM's share of the total market increases, the increase in the amount that it must pay is not directly proportional to its increase in market share, especially if the aggregate total market share of OPMs decreases in the same year.  See Freedom Holdings III, 447 F. Supp. 2d at 235-36.  However, the proofs show that SPMs target the "deep discount" market, and so would be unlikely to follow OPM price increases.  See Tr. 94.  Moreover, even if SPMs did follow OPM price increases, doing so would create a market opportunity for NPMs, not a competitive disadvantage.

does not amount to an antitrust injury.  Plaintiffs' grievance parallels that of any manufacturer against a flat tax, which entails the same compulsion, and New York has unquestioned authority to impose such a tax on all cigarette manufacturers.  Freedom Holdings I, 357 F.3d at 229; see Freedom Holdings II, 363 F.3d at 152.

Further, Plaintiffs offer no evidence to support their theory that the MSA has stifled the OPMs' motivation to compete with each other on price.  As Plaintiffs recognize, the OPMs, by raising prices beyond the level dictated by their MSA payments, expose themselves, even on their premium product lines, to market erosion by NPMs that sell nearer to their marginal cost, after accounting for escrow payment obligations.  Second Suppl. & Am. Compl. ¶¶ 25-26.  The parties disagree on the extent of price elasticity and brand salience in the cigarette market, but the data show, and Plaintiffs concede, that cigarette consumers respond to differences in price.  As Plaintiffs assert, "the differential in wholesale prices between the fourth-tier cigarettes sold by NPMs . . . and the premium brands is now $17/carton."  Id. ¶ 46 n.4. NPMs may wield fewer resources for marketing and advertising than PMs and lack the economies of scale of the larger PMs.  But NPMs can exploit any disproportionate price increase by PMs by selling cigarettes at lower prices, and have done so vigorously to the NPMs' market advantage.  See Tr. 96, 125; see also Sanders, 504 F.3d at 911 ("If the OPMs really are charging artificially high prices, and thus making artificially high profits, an NPM conceivably could compete on price by charging a 'normal' price and still make a 'normal' profit, even taking the escrow payment into account.").  Thus, "apportionment [of market share] among OPMs is an internal matter which does not affect the ability of NPMs to compete in any material way." Freedom Holdings III, 447 F. Supp. 2d at 257.

I found in Freedom Holdings III, and I find again, that the States did not intend to create a scheme for market control in favor of the four major cigarette companies that became

the OPMs, or in favor of any other cigarette companies.  Plaintiffs have presented no proof of

such a purpose.  The MSA contemplated that PMs would increase their prices, but such increases

are consistent with the redeeming social purpose of deterring consumption and sales of

cigarettes.  The Escrow and Contraband Statutes, and, more recently, the Allocable Share

Release amendments, have forced NPMs also to raise their prices for the same redeeming social

purpose, to prevent the MSA from being destroyed, and to assure that future lawsuits by the

States against the NPMs will not be frustrated by those companies' financial irresponsibility.

       As I found in <u>Freedom Holdings III</u>, the States intended that their settlement with

the four major tobacco companies have important social benefits, namely, reduction of tobacco

consumption, restriction of tobacco advertising and marketing, and transfer of cigarette-induced

health care costs from the States to the tobacco companies themselves.  The New York Supreme

Court, in approving the settlement between New York and the OPMs, found that the MSA

achieved the State's critical objectives, more fully than if the lawsuit had gone to judgment.

<u>New York v. Philip Morris</u>, 686 N.Y.S.2d at 568-69.  The Court articulated these objectives in its

findings:  an injunction against cigarette sales to minors and advertisements targeting minors,

greater disclosure of the health effects of tobacco and nicotine, and funding of educational and

clinical programs that publicize and treat the health consequences of cigarette smoking.  <u>Id.</u>  It

concluded:

> [T]he MSA adequately protect[s] the public interest . . . . [T]he economic and
> noneconomic benefits for New York State are substantial [and] are consistent
> with and advance the objectives of New York public policy as set forth in the
> amended complaint."

<u>Id.</u> at 568.  Indeed, the massive flow of funds from the PMs has substantially contributed to the

financial welfare of the settling States; between 1999 and 2008, New York alone received nearly

$7.7 billion.  As for the Escrow Statute, the New York Legislature elaborated on the state policy

behind the MSA in its findings and explained how the Escrow Statute furthers that policy:

> It is the policy of the state that financial burdens imposed on the state by cigarette
> smoking be borne by cigarette product manufacturers rather than by the state to the
> extent that such manufacturers either determine to enter into a settlement with the
> state or are found culpable by the courts. . . . It would be contrary to the policy of
> the state if [NPMs] could use a resulting cost advantage to derive large, short-term
> profits in the years before liability may arise without ensuring that the state will
> have an eventual source of recovery from them if they are proven to have acted
> culpably.

N.Y. Pub. Health Law § 1399-nn(4), (6).

I found at the preliminary injunction stage, Freedom Holdings III, 447 F. Supp. 2d

at 250, and I find again on the basis of a full and complete record, that the States intended the

MSA and the Escrow and Contraband Statutes not as "naked restraints on trade," but as means of

achieving important public health goals and substantial fiscal benefits.  In Freedom Holdings I,

the Court of Appeals accepted Plaintiffs' allegations as if proved, for it was reviewing a motion

to dismiss pursuant to Fed. R. Civ. P. 12(b).  However, Plaintiffs have failed to prove the

allegations of their Complaint, and thus the foundation for the Court of Appeals' rulings does not

exist.  Plaintiffs have presented no credible proof that the MSA has created a cartel favoring

participating cigarette manufacturers.  Nor have they presented proof that the NPMs have

suffered, or are likely to suffer, any antitrust injury.

I found in Freedom Holdings III, and I find again, that the MSA does not

"mandate[] or authorize[] conduct that necessarily constitutes a violation of the antitrust laws in

all cases, or . . . place[] irresistible pressure on a party to violate the antitrust laws in order to

comply with the statute."  447 F. Supp. 2d at 251 (quoting Rice, 458 U.S. at 661).  The continued

strength of NPMs proves as much, and the absence of financial pressure on NPMs to join the

MSA confirms it.  Nothing in the Escrow or Contraband Statutes mandates or authorizes "illegal

conduct in all cases," an essential ingredient of a per se antitrust violation.  Id.; see KT&G Corp., 535 F.3d at 1132-33; Trident Int'l Corp. v. Kentucky, 467 F.3d 547, 557 (6th Cir. 2006) (analyzing Freedom Holdings I and finding Kentucky statutes implementing the MSA not preempted by Sherman Act).  The analogy to per se violations of the antitrust laws does not fit, as the proofs show neither anticompetitive effect nor lack of redeeming social purpose.  See Rice, 458 U.S. at 659 n.5.  Therefore, adhering to my findings and conclusions of law in Freedom Holdings III respecting Plaintiffs' antitrust claims, I hold that Plaintiffs have failed to establish that the MSA's terms, along with those of the Escrow and Contraband Statutes, constitute a per se violation of § 1 of the Sherman Act.

## 2. *Parker* State Action Immunity

Because I find no per se antitrust violation, I need not address whether New York's legislation is preempted by federal antitrust law.  See Parker, 317 U.S. at 341 (holding that a court must find that a state is guilty of a per se antitrust violation before evaluating whether redemptive purpose exempts it from application of federal antitrust law); see also Rice, 458 U.S. at 662 n.9.  However, I assume for purposes of Parker analysis that Plaintiffs have proved a per se violation, see Freedom Holdings I, 357 F.3d at 226, and I will proceed on that assumption to analyze each prong of the Midcal-Parker test.  See Cal. Regional Liquor Dealers Ass'n v. Midcal Aluminum, Inc., 445 U.S. 97 (1980).  This test provides that a state statute is exempt from antitrust preemption if "(i) the restraint in question is 'clearly articulated and affirmatively expressed as state policy,' and (ii) the policy is 'actively supervised' by the state itself." Freedom Holdings I, 357 F.3d at 205 (quoting Midcal, 445 U.S. at 105).  The Court of Appeals, assuming Plaintiffs' allegations as proved, held that the Escrow and Contraband Statutes do not qualify for Parker immunity because New York fails to satisfy both the "articulation" and "supervision" prongs.  Id. at 226-32.  It suggested, however, that failure to satisfy the first prong

would not by itself preclude immunity, thus focusing the inquiry on whether New York actively supervises the workings of the MSA.  Freedom Holdings II, 363 F.3d at 156.

     The proofs make clear that New York satisfies both prongs.  As I found in Freedom Holdings III, and as I find again, New York has clearly articulated its reasons for entering into the MSA and how the MSA's features advance its goals, and New York, through the yearly reporting mechanisms required by the MSA and the neutral analysis and reporting functions performed by PricewaterhouseCoopers, has actively supervised the MSA to assure that it continues to achieve its purposes without anticompetitive consequences.

     Midcal requires, as its first prong, that New York "act in furtherance of legitimate state policy goals and [that] its acts must have a plausible nexus to those goals."  Freedom Holdings II, 363 F.3d at 156.  On the basis of the pleadings, the Court of Appeals held that New York had not explained how the provisions of the MSA, such as those linking OPM payment obligations to their market shares, actually further the public health.  Freedom Holdings I, 357 F.3d at 229-30.  The proofs make clear, however, that which the Court of Appeals failed to find.  Because of higher cigarette prices, provoked by the substantial payments made by the cigarette companies to the States, cigarette sales have fallen by 24%, from 484.5 billion cigarettes in 1997 to 365.8 billion cigarettes in 2007.  The 97.1% oligopoly enjoyed by the four major cigarette companies that were the OPMs in 1997 has been reduced to 85.9% in 2007, and smaller cigarette companies have entered and thrived in the market.  New York alone, of the forty-six states that settled with the cigarette companies, has received nearly $7.7 billion from the PMs, and the potential for more from the many escrow accounts created for NPMs.  In short, the purposes endorsed by the New York Supreme Court have come to pass.  See New York v. Philip Morris, 686 N.Y.S.2d at 568.  The MSA has brought about a substantial reduction in cigarette consumption and substantial reimbursements to the States for the public costs of cigarette

consumption, all without adversely impacting non-participating manufacturers.  New York has

ensured, by implementing legislation pursuant to the MSA, that these beneficial achievements

are not corrupted by allowing NPMs to sell cigarettes at prices unburdened by any payment

obligation, and potentially to dodge liability by closing up shop and selling elsewhere.  As I held

in Freedom Holdings III, 447 F. Supp. 2d at 260-61, New York has articulated reasonable goals,

linked to its public health needs, and its redeeming public purpose is inconsistent with a finding

of a per se antitrust violation.

Likewise, the proofs show "active supervision" by New York sufficient to meet

the second Midcal prong.  The MSA provides for an auditing mechanism that requires

PricewaterhouseCoopers to collect statistical information about cigarette manufacturer sales,

costs, and market share and to report that information to the States and the public.  Through this

data, New York has closely tracked the actual workings of the MSA, including the competitive

effects of the MSA regime.  New York has also conducted detailed oversight through capturing

the data produced by the Contraband Statute of all NPM sales in New York.  See N.Y. Tax Law

§§ 480-b, 481(1)(c), 1846.

By this statistical oversight, New York has satisfied the requirements for Parker

immunity.  Since the statistics make clear that the MSA has not proven to be anticompetitive,

there has been no requirement that New York intervene to prevent a cartelization of the market.

Nor has there been any indication of price collusion, for, as all the NPM witnesses testified,

cigarette pricing is autonomously and independently made, with higher than necessary pricing by

the majors creating opportunities for smaller, independent cigarette sellers.  Unlike the statute

challenged in Midcal, which involved explicit price-fixing, see Midcal, 445 U.S. at 100-01, the

statutes challenged here have not interfered with competition.  The MSA has served legitimate

health and welfare objectives without handicapping NPMs or creating any anticompetitive

effects.  Accordingly, I find that New York has satisfied both prongs of the <u>Midcal</u>-<u>Parker</u> state action immunity test.

<strong>D.        The Injunction Against the Allocable Share Release Amendment</strong>

In <u>Freedom Holdings III</u>, I preliminarily enjoined New York from enforcing an amendment to the Allocable Share Release provision of its Escrow Statute.  447 F. Supp. 2d at 264-65; <u>see</u> N.Y. Pub. Health Law § 1399-pp, as amended, 2003 N.Y. Laws 666, eff. Oct. 15, 2003.  Informed by further briefing and evidence, I now deny Plaintiffs' request for a permanent injunction and dissolve the preliminary injunction.

Under the MSA, New York's allocable share, in relation to all other States that settled with the OPMs, is about 12.76%.  New York receives that proportion of funds paid by all PMs annually.  In contrast, New York receives a fixed amount from NPMs making escrow payments under its Escrow Statute, $0.0188482 (in 2007 and subsequent years) for each cigarette actually sold, or imported into, the State.  N.Y. Pub. Health Law § 1399-pp(2)(a)(v).  However, because of the Allocable Share Release provision ("ASR"), § 1399-pp(2)(b)(ii), NPMs are entitled to a credit to the extent that the funds paid into escrow exceed New York's allocable share of all escrow payments made by the NPM into the escrows of all States.  The ASR thus allows an NPM that concentrates its sales in one or a few states to offset by credit most of its escrow obligations, gaining a major competitive advantage over the OPMs and other PMs that market nationally.[16]

The OPMs complained of this undue competitive advantage, and sought refund or credit against their payments, invoking the NPM Adjustment provisions of the MSA.  As described above, those provisions reduce the payments due by PMs by three times the amount of

---

[16] Kevin Altman, who worked for two NPMs, testified that NPMs receive their credit very soon after they make their payment into escrow.  Tr. 24.

market share loss over 2%, if the PMs prove a collective loss of market share to NPMs, that the MSA was a "significant factor" in that loss, and that the State in issue failed to enact or diligently enforce an Escrow Statute.  MSA Art. IX(d).  An independent study conducted by The Brattle Group found in favor of the OPMs, concluding that "MSA disadvantages were a significant factor contributing to the Market Share Loss in 2005," as well as in prior years.  Pl. Exh. 362, ¶ 228.  The States nonetheless maintained that no NPM Adjustment was appropriate because the States had effectively legislated to prevent the NPMs from undercutting the MSA.  One such preventative measure was an amendment to the Escrow Statutes intended to prevent NPMs from abusing ASRs.  This Allocable Share Release amendment, also known as an ASR repealer, allowed release of escrowed funds only at the close of the twenty-five year term or when necessary to pay judgments or settlements:  NPMs could no longer obtain a yearly credit of funds paid into escrow to the extent that they exceed the State's allocable share.

In Freedom Holdings III, reacting to New York's just-passed ASR amendment, and without the benefit of the proofs discussed above and at the evidentiary hearing that I conducted, I enjoined implementation of the amendment.  Without a record, I was concerned about possible effects on competition and the potential for evidence that the State or the public would suffer injury.

I am persuaded, however, by the evidence and further consideration, that my injunction should be dissolved.  First, though Plaintiffs have presented evidence of the financial troubles of some regional NPMs after ASR repeals, they offer no proofs to show that, in the absence of the ASR, the MSA and Escrow and Contraband Statutes constitute a per se antitrust violation.  The ASR encouraged NPMs to concentrate their sales within particular States, and thereby to defeat the Escrow and Contraband provisions of those States' laws.  The ASR repeal has canceled that encouragement, leading NPMs in some instances to engage in "state-shifting"

30

by refocusing their sales to States yet to repeal their ASRs, and then to the Internet and Indian

reservations, where sales are not subject to escrow payments.  See Tr. 97-102, 364-65.  The ASR

repeals have reduced the degree of competitive advantage enjoyed by NPMs due to the MSA.

See Pl. Exh. 362, ¶¶ 83-87.  But Plaintiffs have not shown that the MSA without the ASR

disables them from competing in the cigarette market.  With or without the ASR, NPMs enjoy

pricing autonomy and need not follow price hikes by OPMs, particularly price hikes that

overcompensate for the MSA payment burdens.  See Xcaliber Int'l Ltd. v. Edmondson, No. 04-

CV-0922-CVE-PJC, 2005 WL 3766933, at *2 (N.D. Okla. Aug. 31, 2005) ("[A]ll cigarette

manufacturers, even under the cost constraints imposed by the MSA and the Allocable Share

Amendment, have choices as to price and output, and . . . make their decisions as to these issues

unilaterally."); see also Int'l Tobacco Partners, Ltd. v. Beebe, 420 F. Supp. 2d 989, 997 (W.D.

Ark. 2006).  With or without the ASR, NPMs have ample incentive to compete for market share

and ample opportunity to do so, as their escrow payments, even if unrecoverable in the short

term, are no more debilitating than the corresponding payments required of PMs.  With or

without the ASR, NPMs pay less per carton under the Escrow Statutes than the OPMs and non-

grandfathered SPMs pay, and less per carton than the grandfathered SPMs pay for each marginal

carton produced above their grandfathered thresholds.  Just as Plaintiffs fail to show that NPMs

suffer a special hardship compared to other manufacturers under the MSA as originally

conceived, they fail to show that NPMs will suffer a special hardship under an MSA that denies

them the ASR's yearly recovery of funds.  See KT&G Corp., 535 F.3d at 1128-29.

       Second, the ASR amendment furthers New York's aims in signing the MSA by

protecting the State against the impact on public health costs of a disproportionate inundation of

cigarette sales within the State.  The public welfare purpose of the MSA is enhanced by

repealing the ASR, which discourages NPMs from concentrating sales in particular States at the

expense of the public health and welfare of such States, and ensures that such States, including

New York, are compensated for every cigarette sold in the State.  With my preliminary

injunction in place, New York retains in escrow only 12.76% of any individual NPM's per-

cigarette payments, regardless of whether that NPM sells 12.76%, 50%, or 100% of its cigarettes

in New York.  Likewise, with the injunction in place, New York is assured compensation for

12.76% of the total damage to the public health caused by that NPM, regardless of whether that

NPM caused 12.76%, 50%, or 100% of its total damage in New York.  The injunction creates an

incentive for cigarette manufacturers to disseminate their product and its ruinous consequences

within the State while recompensing the State's citizens only incompletely for the injury they

sustain.  By dissolving the preliminary injunction, I allow New York to join the vast majority of

other States that have removed the ASR from their Escrow Statutes so as better to fulfill the

purposes of the litigation that the MSA resolved.

   The Centers for Disease Control and Prevention estimates that, in 2002, New

York incurred $149.70 per carton in productivity costs related to smoking, as well as $57.00 per

carton in cigarette-related Medicaid costs.[17]  The ASR amendment requires all NPMs to pay their

fair share of these costs without hindering them competitively against the PMs.  Accordingly, I

find by a preponderance of the credible evidence that, even after repeal of New York's Allocable

Share Release provision, the MSA and Escrow and Contraband Statutes do not constitute a per se

violation of the Sherman Act.  No permanent injunction is justified, and the preliminary

injunction is dissolved.

---

[17] Polishook Decl., Exh. G, at 11.  Because these figures suggest that cigarettes represent a per-stick net drain on the public fisc, they undercut the notion that New York's "goals of serving public health and enhancing revenue conflict."  Contra Freedom Holdings I, 357 F.3d at 230.

**F.**      **Commerce Clause Claim**

The Commerce Clause empowers Congress to "regulate Commerce . . . among the several States."  U.S. Const. art. I, § 8, cl. 3.  In its "dormant application," it limits "a state's power to take actions impacting interstate commerce."  Freedom Holdings I, 357 F.3d at 216.  The Commerce Clause limits state regulatory power in three ways.  First, a state law is per se invalid if it clearly discriminates against interstate commerce in favor of intrastate commerce.  Id.  Second, under the "Pike balancing test," a state law is invalid if it is nondiscriminatory but "imposes a burden on interstate commerce incommensurate with the local benefits secured."  Id. (quoting Nat'l Elec. Mfrs. Ass'n v. Sorrell, 272 F.3d 104, 108 (2d Cir. 2001)); see Pike v. Bruce Church, Inc., 397 U.S. 137, 142 (1970).  Third, a state law is invalid if it has the "practical effect" of controlling commerce occurring entirely outside the state's borders.  Freedom Holdings I, 357 F.3d at 216 (citing Healy v. The Beer Inst., 491 U.S. 324, 336 (1989)).  However, a state law is not invalid under the Commerce Clause if its only out-of-state impact is to elevate the price of goods in interstate commerce.  Id. at 220 (noting that "upstream pricing impact" alone does not violate Commerce Clause).

In Freedom Holdings I, the Court of Appeals rejected all of Plaintiffs' arguments that the Contraband Statutes implementing the MSA violate the dormant Commerce Clause.  It held that Plaintiffs had failed to show that the Contraband Statutes have a "disparate impact on interstate commerce," as required by both the discrimination and Pike balancing test theories.  Id. at 218.  Likewise, under the extraterritoriality analysis, the Court held that Plaintiffs had failed to show that the Contraband Statutes "regulat[e] commerce occurring wholly outside the borders of New York" or have the "practical effect of control[ing] conduct beyond the boundaries of the State."  Id. at 219.  The Court found that the Commerce Clause, which "protects against inconsistent legislation arising from the projection of one state regulatory regime into the

jurisdiction of another State," id. at 220 (quoting Healy, 491 U.S. at 337), had no reason to

protect against the MSA, "a universal and practically uniform national system of payments by

tobacco companies to states." Id. at 220 n.13. Plaintiffs argued that the Contraband Statutes

regulate out-of-state commerce by fostering "artificially high prices" in the chain of distribution

of cigarettes destined for New York, but the Court of Appeals found that effect to be "no more

than the upstream pricing impact of a state regulation," noting that "out-of-state actors . . .

remain free to conduct commerce on their own terms, without either scrutiny or control by New

York State." Id. at 220-21. The Court of Appeals observed, from the relevant Supreme Court

precedents, that the Dormant Commerce Clause was offended by state statutes that purported

specifically to regulate out-of-state pricing decisions, or in-state pricing decisions that were

required to relate to out-of-state prices. Id. at 221; see Healy, 491 U.S. at 326 (statute requiring

seller to certify that in-state prices are no higher than any out-of-state prices); Brown-Forman

Distillers Corp. v. N.Y. State Liquor Auth., 476 U.S. 573, 575-76 (1986) (statute forbidding

distiller to change out-of-state prices after posting in-state price); Baldwin v. G.A.F. Seelig, Inc.,

294 U.S. 511 (1935) (statute banning resale of out-of-state milk purchased at price below in-state

minimum price). By contrast, the Escrow and Contraband Statutes set no particular price for in-

state sales and mandate no relationship whatever between in-state and out-of-state cigarette

prices.

    I allowed Plaintiffs to amend the Complaint to reassert a Commerce Clause claim

in light of Grand River Enters. Six Nations, Ltd. v . Pryor, 425 F.3d 158 (2d Cir. 2005), which

the Court of Appeals decided one year after Freedom Holdings I. In Grand River, the Court,

ruling on the allegations of the complaint and not on the proofs, reversed the District Court and

ordered that the plaintiffs could lawfully claim that the Escrow Statutes "limit, burden and

regulate directly interstate commerce wholly outside the respective states." Id. at 170 (citations

omitted).  The Court noted that, while the <u>Freedom Holdings I</u> complaint had identified as an

extraterritorial effect price increases in the distribution chain of cigarettes sold to New York

retailers, the <u>Grand River</u> complaint more broadly alleged a "uniform system of regulation that

results in higher prices nationwide."  <u>Id.</u> at 171.  The Court of Appeals ruled that the plaintiffs

had "successfully stated a possible claim that the practical effect of the challenged statutes and

the MSA is to control prices outside of the enacting States by tying both the SPM settlement and

NPM escrow payments to national market share, which in turn affects interstate pricing

decisions."  <u>Id.</u> at 173.  In so holding, the Court stressed that it "[took] no position as to the

ultimate viability of the dormant commerce clause claim," having accepted as true the facts

alleged in the complaint and drawn all reasonable inferences in favor of the plaintiffs.  <u>Id.</u>

      On remand, the District Court denied the plaintiffs' request for a preliminary

injunction, finding that they were not likely to succeed on any of their claims, including the

dormant Commerce Clause claim.  <u>Grand River Enters. Six Nations, Ltd. v. Pryor</u>, No. 02 Civ.

5068 (JFK), 2006 WL 1517603, at *8-*10 (S.D.N.Y. May 31, 2006) ("Even if . . . the amount of

an escrow refund 'is, in part, keyed to the amount an NPM would have paid if it had joined the

MSA as an SPM[,]'. . . Grand River has not shown that this scheme may result in interstate price

control.") (quoting <u>Grand River</u>, 425 F.3d at 172).  Distinguishing the MSA and its

implementing statutes from those defeated in price-parity cases like <u>Healy</u> and <u>Brown-Forman</u>,

Judge Keenan emphasized that the New York legislation "neither makes cigarette prices or

escrow payments in a particular State dependent on prices or escrow payments in other States,

nor does it have any effect on price or escrow payments by NPMs in other states."  <u>Id.</u> at *9; <u>see</u>

<u>also</u> <u>Int'l Tobacco Partners v. Kline</u>, 475 F. Supp. 2d at 1089-92.

      In the instant case, Plaintiffs, having copied the <u>Grand River</u> complaint, allege

that the statutes implementing the MSA were intended to create, and have created, a uniform

system of regulation that has resulted in higher prices nationwide for domestic cigarettes. Second Suppl. & Am. Compl. ¶¶ 97-102.  They argue that New York's Escrow Statute controls out-of-state cigarette prices because the escrow payment that an NPM makes to New York depends, in part, on what the NPM would owe New York as an SPM, which depends in turn on the national market shares of the SPMs, which derive in part from the pricing of cigarettes sold outside New York.  Plaintiffs reason that the MSA and New York Escrow and Contraband Statutes therefore violate the principle of Healy and are invalid under the dormant Commerce Clause.

In Healy, the Supreme Court reaffirmed its "established view that a state law that has the 'practical effect' of regulating commerce occurring wholly outside that State's borders is invalid under the Commerce Clause."  491 U.S. at 332 (quotations omitted); see Freedom Holdings I, 357 F.3d at 219.  The price affirmation statute in Healy required retailers to affirm that their in-state prices were no higher than prices charged in any other state, thereby imposing in-state consequences for out-of-state commercial decisions.  The statute's practical effect was to project one state's regulatory regime into other states:

> The short-circuiting of normal pricing decisions based on local conditions would be carried to a national scale if a significant group of States enacted contemporaneous affirmation statutes that linked in-state prices to the lowest price in any State in the country. This kind of potential regional and even national regulation of the pricing mechanism for goods is reserved by the Commerce Clause to the Federal Government and may not be accomplished piecemeal through the extraterritorial reach of individual state statutes.

Healy, 491 U.S. at 340.  Discussing Healy in Freedom Holdings I, the Court of Appeals warned that it invalidates only "regulation" or "control" of out-of-state commerce.  Mere "upstream pricing impact" is not a violation of the dormant Commerce Clause, even if the impact is felt out-of-state where the stream originates.  Freedom Holdings I, 357 F.3d at 220.

Plaintiffs in this case show no more than upstream pricing impact, if that.  There has been no showing that mandated escrow payments by NPMs in New York affect the retail price of cigarettes elsewhere in the nation.  NPMs make escrow payments in New York as security to satisfy judgments or settlements in litigation with New York.  The Allocable Share Release provision does nothing to regulate, restrict, or control out-of-state behavior of NPMs or SPMs.  "Each NPM or SPM must make its own unilateral decision with respect to price and output, and no state agent has the power to dictate the prices or outputs of any cigarette manufacturer."  Grand River, 2006 WL 1517603 at *9.[18]  The phenomenon of a nationwide increase in cigarette prices following the advent of the MSA resulted, not from the "extraterritorial reach" of any one State's statute, but because many States enacted similar statues.[19]  See Healy, 491 U.S. at 332.  New York exerts no control, actual or "practical," over the price of cigarettes in any other State.  See id.

As the Court of Appeals held in Freedom Holdings I, Plaintiffs must show more than the fact that New York's legislation indirectly affects out-of-state cigarette prices.  They must show that commercial actors outside New York are bound in some way by the dictates of New York statutes.  Freedom Holdings I, 357 F.3d at 221.  Because they have not made such a showing, I hold that Plaintiffs have failed to prove that the MSA and Escrow and Contraband Statutes are invalid under the dormant Commerce Clause.

---

[18] NPM witnesses in this case testified to the same effect, that their prices were set internally and not dictated by OPM or SPM prices.  Tr. 87-88, 109-10.

[19] One commentator suggests that the coordinated, nationally-oriented character of state action resulting from the MSA might raise constitutional concerns under the Interstate Compact Clause, U.S. Const. art. I § 10, cl. 3; see generally Michael S. Greve, Compacts, Cartels, and Congressional Consent, 68 Mo. L. Rev. 285 (2003).  The claim is not before me, and at least one court of appeals has rejected it.  See Star Scientific, Inc. v. Beales, 278 F.3d 339, 360 (4th Cir. 2002).

## V.  **Conclusion**

Plaintiffs have shown no injury to their business or property, actual or threatened. They have failed to show that the Master Settlement Agreement and the Escrow and Contraband Statutes of New York are anticompetitive under the Sherman Act or invalid under the Commerce Clause of the U.S. Constitution, either before or after the Allocable Share Release amendment. The preliminary injunction against enforcement of New York's Allocable Share Release amendment is dissolved.

The Clerk shall terminate the motions (Docs. #144 & #160) and enter judgment for Defendants.

SO ORDERED.

Dated:        January **12**, 2009
                  New York, New York

                                                                       ALVIN K. HELLERSTEIN
                                                                       United States District Judge

38